FILED

IN THE UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

2011 JUN 24  P 3: 39

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| MAJEED N. ABED, an individual<br>residing at 6913 Versaille Dr.<br>Fredericksburg, VA 22407<br>Spotsylvania County<br><br>Plaintiff,<br><br>v.<br><br>BEST BUY CO., INC.,<br>7601 Penn Avenue South<br>Richfield, MN 55423-3645<br><br>Registered Agent:<br>CT Corporation System<br>4701 Cox Road, Suite 301<br>Glen Allen, VA 23060-6802<br><br>Defendant. | Civil Action No. 1:11 cv 686<br>AJT/JFA<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Pursuant to Rule 8(a) of the Federal Rules of Civil Procedure, Plaintiff Majeed "Todd" Abed, by and through his undersigned counsel, brings the following complaint against Defendant Best Buy Company, Inc. ("Best Buy"), alleging as follows:

### Nature of the Action

1. This is an action to recover for damages as a result of discrimination and retaliation inflicted upon Plaintiff Todd Abed by his employer, Best Buy. Abed, a Muslim of Arab descent, earned a record of achievement over thirteen years of service in Best Buy's District 91. That record came to an abrupt end, however, soon after Abed began objecting to a

practice of racial and ethnic profiling at Best Buy stores. Because of this principled stand, Abed's district manager Michael Romano determined to end Abed's career. Romano twice denied Abed promotions from Product Process Manager to General Manager despite his being the most qualified applicant. Moreover, he directed those whom he did hire for the position, including Ryan Dildine, to generate pretextual reasons to terminate Abed. Dildine, in turn, taunted Abed for his religion, sabotaged Abed's performance evaluations, placed Abed under a disciplinary "Action Plan," and terminated Abed for non-performance. Tellingly, Abed was denied mandatory feedback under his Action Plan, was denied access to Best Buy's "Peer Review" process for preventing supervisor abuse, and was prevented from being transferred to another district that had expressly indicated a willingness to employ him despite the "Action Plan." Abed suffered enormously for this capricious snuffing of his promising Best Buy career. He now seeks compensation for his damages, including back pay, front pay, compensatory and punitive damages, and attorney's fees. Most importantly, he seeks a court order permanently ending Best Buy's illegal customer profiling practices.

## Parties

2. Plaintiff Majeed N. Abed is an Arab-American Muslim man residing at 6913 Versaille Drive, Fredericksburg, VA 22407.

3. Defendant Best Buy Co., Inc. is a Minnesota corporation with retail stores in Virginia and throughout the United States. Best Buy is one of the country's largest retail electronics sellers and specializes in consumer electronics, home office supplies, entertainment software, appliances, and related services. As of fiscal year 2010, Best Buy operated 1,069 retail stores in the United States and employed approximately 180,000 full-time, part-time and seasonal employees. The Company generated $50 billion in revenue during fiscal year 2010.

## Jurisdiction and Venue

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

5. Venue is proper under 28 U.S.C. § 1391.

## Factual Background

### A. Plaintiff's Employment History

6. Majeed "Todd" Abed began working at Best Buy in October 1996.

7. Abed consistently gained promotions and pay raises over the next thirteen years.

8. For example, Abed's first performance evaluation, in October 1997, graded him as 3.0 ("Fully meets expectations").

9. On March 7, 1998, Abed received a "Performer's Club" award "in recognition of a job well done!"

10. In 2005, Abed received the Brad Anderson Legacy Stock Award. This highly competitive award recognizes, in the words of the Defendant, "this idea of what people—seemingly ordinary people—can do when given the opportunity to create extraordinary outcomes for our customers."

11. The November 11, 2005 letter sent to Abed from Best Buy announcing the award stated:

> [Y]ou have been singled out for your outstanding achievements and chosen from thousands of employee nominations to receive a Special Stock Option grant of 250 options. You should be proud of yourself. We are. You have worked hard to help Best Buy accomplish its long-term goals in the areas of organic growth and innovation.

12. By 2008, Abed had attained the position of Product Process Manager. His immediate supervisor was General Manager Scott Deane. His district manager for District 91 was Michael Romano. Lisa Gray was his district manager for human resources.

13. Having worked for Best Buy for over a decade, Abed had every intention of serving Best Buy for the remainder of his career.

**B. The Discriminatory "BOLO" Program**

14. In the summer of 2008, District 91 stores began participating in Best Buy's "Be On the Look Out" ("BOLO") program. This program, implemented against the backdrop of the corporate policy of customer stereotyping reflected in the "customer-centricity" model, facilitated customer stereotyping regarding whether a particular customer appeared likely to engage in shoplifting, fraudulent credit card transactions, or other illegal activity.

15. Under BOLO, Best Buy employees circulated e-mails among all managers in the region containing images and descriptions of customers supposedly suspected of theft to be posted in their respective stores, primarily at the loss prevention stand.

16. Rather than reflect objectively suspicious activity (*e.g.*, someone observed leaving the store with un-purchased merchandise, someone who left the store when questioned to show ID to verify a credit card transaction, someone observed slipping merchandise into a coat pocket, etc.), the images and descriptions circulated under BOLO consistently involved racial and ethnic minorities who had done nothing to merit suspicion.

17. For example, e-mails circulated under the BOLO program identified customers as suspicious based on nothing more than bare descriptions such as "bearded Middle Eastern guy who looked shady" or "black ghetto guy."

18. Abed, the supervisor in charge of loss prevention (i.e., theft), believed that the racial profiling demonstrated in the BOLO program was offensive and illegal. He decided to advocate for Best Buy's customers and decided to refrain from posting the discriminatory BOLO images and descriptions in his store.

19. As a result of this decision, District 91 HR Manager Lisa Gray contacted Abed in June or July 2008 to inquire why he was not utilizing the BOLO procedures.

20. Abed explained to Gray the discriminatory effect of the BOLO e-mails on Best Buy's customers. In response, Gray circulated a district-wide email warning employees that discriminatory use of the BOLO program could subject Best Buy to legal liability, but instructed him to post the BOLO e-mails anyway.

21. During a store visit on or about the spring of 2009, Gray asked Abed again why he was not posting BOLO emails in the store. Abed repeated his belief that BOLO was implemented in a discriminatory fashion. Gray circulated a second e-mail warning to Best Buy employees regarding discrimination in BOLO, but instructed Abed—again—that he should post the BOLO emails anyway.

22. In late 2009, Gray sent yet another district-wide e-mail warning employees that for several months BOLO had been employed in a discriminatory manner that could subject Best Buy to legal liability. She further warned them that the BOLO e-mails were discoverable.

23. Romano, the District 91 Manager, received these e-mails and knew that Abed had expressed an objection to BOLO to Gray based on its discriminatory nature.

24. On information and belief, Gray and Romano made no genuine efforts to address the widespread customer profiling, and the practice continues to this date.

25. On information and belief, Romano preferred to remove the complaining Abed from Best Buy rather than confront the discriminatory practices he and others practiced through BOLO.

## C. First Denial of Promotion to Abed

26. On or about August 2008, shortly after Abed first began opposing BOLO, Best Buy promoted Abed's general manager Scott Deane to a position in another district.

27. Deane urged Abed to apply as his replacement and strongly recommended him to the decisionmakers, Gray and Romano.

28. Abed was the most qualified of the individuals with applications pending when the submission period expired.

29. Rather than award the position to Abed, however, Romano re-opened the position after the deadline for submissions had passed.

30. Romano selected William Fuentes, a non-Arab and non-Muslim, for the position.

## D. Romano's Campaign Against Mr. Abed

31. Shortly after hiring William Fuentes as a general manager, Romano told Fuentes that Abed was "not capable" of succeeding at Best Buy despite his demonstrated success over thirteen years.

32. Romano further instructed Fuentes to fabricate a reason to "write up" Abed as soon as possible, to put him on an "Action Plan,"[1] and to terminate him as soon as the Action Plan had run its course.

33. According to Fuentes, however, Abed was a very hard worker who led by example and who impressed Fuentes with his diligence and responsiveness to instruction.

34. Fuentes informed Abed of Romano's instructions but promised not to take any unjustified employment action against Abed.

---

[1] An "Action Plan" is an agreed-upon framework for accountability between Best Buy and its employees designed to improve employee performance. Typically, an Action Plan specifies goals for the employee and establishes a schedule of monitoring of the goals by management.

35. Throughout Fuentes's brief tenure as general manager of Abed's store, Romano continued to instruct Fuentes to fabricate a reason to terminate Abed. Fuentes refused to do so.

### E. Second Denial of Promotion to Abed

36. Fuentes left Best Buy for a position in another company in the spring of 2009, re-creating the vacancy in the general manager position.

37. Romano told Abed not to re-apply for the general manager position.

38. Abed applied for the position anyway.

39. Abed again was the most qualified individual applying for the general manager position at the expiration of the submission period.

40. Romano refused to grant Abed an interview.

41. Abed asked District 91 Human Resources Manager Gray why he was not being interviewed for the general manager position. She stated that he was not interviewed because his "numbers" were not good enough.

42. When Abed pointed out that another applicant from Abed's store was granted an interview with Romano despite having the same "numbers," Gray stated, "Well, it's Mike [Romano]'s decision."

43. Romano wanted to hire a general manager who, unlike Fuentes, would be willing to trump up a reason to terminate Abed's employment.

44. Romano found what he sought in non-Arab, non-Muslim Ryan Dildine.

45. In March 2009, Romano selected Dildine for the position, despite the fact that Dildine had half as much relevant experience (4 years) as Abed (8 years), and had only been an assistant manager.

### F.     Dildine's Creation of a "Paper Trail"

46.    Almost immediately after taking the job, Dildine began the task that Fuentes had refused—creating a pretext for terminating Mr. Abed.

47.    On May 29, 2009, without any prior discussion, Dildine issued a written warning to Abed for "unacceptable performance." It was the first time Abed had received a written warning in over a decade.

48.    Abed's performance was not unacceptable, however. In fact, Abed received an award for achieving the second-best "look and feel" for a store in Territory 7 under Dildine's tenure. Moreover, on April 23, 2009, just one month prior to Dildine's warning, Abed was rated "Meets Expectations" in his FY2009 performance appraisal.

49.    Rather, Dildine told Abed that the written warning was the "first step" in the "paper trail" Dildine was creating to terminate Abed's employment.

50.    Dildine frequently also used intimidation and discouragement in an attempt to force Abed to resign. Dildine told Abed that he would be "gone within six months," and that he should quit before Dildine fired him. For example, Dildine often asked Abed spitefully how he would provide for his family without his job, wondering aloud how Abed will feel when his children are "starving."

### G.     Dildine's Religious Animus

51.    Dildine specifically expressed hostility for Abed's Islamic religious practices.

52.    For example, Dildine was informed by a co-worker during a staff meeting that as an adherent of Islam, Abed does not eat pork. Rather than respect this religious practice, Dildine specifically ordered ham sandwiches for the staff meeting—which Abed was attending—and

proceeded to taunt Abed. He then insisted that Abed eat a ham sandwich, and asked, "What's the big deal?"

53. On another occasion, in September 2009, Abed requested two vacation days to celebrate the Muslim holiday Eid with his family. Despite Best Buy's recognition of Eid in its advertising circulars, Dildine refused Abed's request, stating that Eid was "not on the American calendar."

**H.    Abed's Action Plan and Termination**

54. In September 2009, Dildine placed Abed on a disciplinary Action Plan. It was Abed's first Action Plan in over a decade.[2]

55. Dildine stated that Abed's Action Plan was a mere formality, that Abed would be fired regardless of its outcome, that there was "nothing [Abed] can do about it." He further stated that Abed should quit Best Buy before he was fired.

56. As Dildine promised, Abed's Action Plan was a sham. Dildine demonstrated no interest in improving Abed's performance and repeatedly failed to provide the accountability and constructive oversight specified in Abed's Action Plan. From September to November 2009, Dildine missed several scheduled "walk-throughs" of Abed's store and skipped several scheduled meetings with Abed to discuss his progress on the plan.

57. Throughout the pendency of Abed's Action Plan, Abed requested that his District support member Diana Joseph evaluate and monitor his compliance. Joseph failed to support him or monitor the Action Plan.

58. Seeking to preserve his career, Abed sought employment at Best Buy stores outside of District 91. In October 2009, the general manager of such a store offered to hire Abed

---

[2] Abed received two Action Plans during his first two years at Best Buy. He completed them successfully, improving his performance en route to numerous promotions and awards.

9

in a parallel position despite the pendency of the Action Plan. Inexplicably, Gray and Romano refused to allow the transfer.

59. On December 17, 2009, Romano and Gray terminated Abed's employment, allegedly for poor performance.

60. Upon information and belief, Abed was the first employee from his store to be terminated for poor performance.

61. Best Buy has a corporate policy of providing "Peer Review" of adverse employment actions to ensure management accountability.

62. Abed was denied access to the Peer Review system.

63. A Best Buy human resources representative informed Abed that he was denied Peer Review because his termination had been "rubber stamped" by Mike Romano and Lisa Gray, and there was no mechanism available to redress such a situation.

64. Abed filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission, Charge Number 438-2010-00616, on May 21, 2010.

65. On March 28, 2011, Abed received a Notice of Right to Sue from the Charlotte District Office of the U.S. Equal Employment Opportunity Commission.

### Count I: Violation of 42 U.S.C. § 1981 ("*Section 1981*")
### (Retaliation—Denial of Promotions)

66. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 65 above as if fully set forth herein.

67. Best Buy engages in a form of racial and ethnic discrimination against its customers through its BOLO program, in violation of Section 1981.

68. Plaintiff held a reasonable, good-faith belief that the BOLO program violated federal law.

69. Best Buy was aware that the BOLO program had been implemented in an unlawfully discriminatory manner.

70. Plaintiff participated in statutorily protected opposition to the discriminatory BOLO program.

71. As a result of his statutorily protected activity, Best Buy denied Plaintiff a promotion to the position of general manager in 2008.

72. As a result of his statutorily protected activity, Best Buy denied Plaintiff a promotion to the position of general manager for a second time in 2009.

73. Defendant understood that issuing adverse employment actions in retaliation for an employee's opposition to unlawful racially and ethnically discriminatory practices is prohibited by federal law, and Defendant acted with malice or with reckless indifference to Abed's federally protected rights.

74. As a direct and proximate result of the acts and omissions alleged above, Abed has suffered and will continue to suffer substantial harm, including but not limited to, past non-economic harm (including damages for garden variety emotional distress, personal indignity, humiliation, and embarrassment), future non-economic harm (including damages for garden variety emotional distress, personal indignity, humiliation, and embarrassment), past economic damages, and future economic damages.

### Count II: Violation of Section 1981
### (Retaliation—Hostile Work Environment)

75. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 74 above as if fully set forth herein.

76. Best Buy engages in a form of racial and ethnic discrimination against its customers through its BOLO program in violation of Section 1981.

11

77. Plaintiff held a reasonable, good-faith belief that the BOLO program violated federal law.

78. Best Buy was aware that the BOLO program had been implemented in an unlawfully discriminatory manner.

79. Plaintiff participated in statutorily protected opposition to the discriminatory BOLO program.

80. Dildine had supervisory authority over the day-to-day activities of Abed, subject to Romano's monitoring and approval, and substantial ability to influence the course of his career.

81. As a result of Abed's statutorily protected activity, Dildine created a hostile work environment for Abed in attempt to force him to quit.

82. Dildine's conduct was sufficiently severe and pervasive to alter the terms, conditions, and privileges of Abed's employment and create an abusive work environment.

83. Dildine engaged in intentional discrimination with malice or with reckless indifference to Abed's federally protected rights. Dildine knew that he may be acting in violation of federal law.

84. Dildine's conduct, as Abed's supervisor and the highest-ranking full-time employee at the store, is imputable to Best Buy.

85. As a direct and proximate result of the acts and omissions alleged above, Abed has suffered and will continue to suffer substantial harm, including but not limited to, past non-economic harm (including damages for emotional distress, personal indignity, humiliation, and embarrassment), future non-economic harm (including damages for emotional distress, personal

indignity, humiliation, and embarrassment), past economic damages, and future economic damages.

### Count III: Violation of Section 1981
### (Retaliation—Wrongful Discharge)

86. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 85 above as if fully set forth herein.

87. Best Buy engages in form of racial and ethnic discrimination against its customers through its BOLO program in violation of Section 1981.

88. Plaintiff held a reasonable, good-faith belief that the BOLO program violated federal law.

89. Best Buy was aware that the BOLO program had been implemented in an unlawfully discriminatory manner.

90. Plaintiff participated in statutorily protected opposition to the discriminatory BOLO program.

91. As a result of his statutorily protected activity, Best Buy terminated Plaintiff's employment at Best Buy.

92. Defendant understood that terminating an employee in retaliation for opposition to unlawful racially and ethnically discriminatory practices is prohibited by federal law, and Defendant acted with malice or with reckless indifference to Abed's federally protected rights.

93. As a direct and proximate result of the acts and omissions alleged above, Abed has suffered and will continue to suffer substantial harm, including but not limited to, past non-economic harm (including damages for garden variety emotional distress, personal indignity, humiliation, and embarrassment), future non-economic harm (including damages for garden

variety emotional distress, personal indignity, humiliation, and embarrassment), past economic damages, and future economic damages.

### Count IV: Violation of Title VII of the Civil Rights Act of 1964, as amended ("*Title VII*")
### (Hostile Work Environment: Religion)

94. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 93 above as if fully set forth herein.

95. Dildine had supervisory authority over the day-to-day activities of Abed, subject to Romano's monitoring and approval, and substantial ability to influence the course of his career.

96. As a result of Abed's membership in a protected class (a Muslim), Dildine created a hostile work environment for Abed in an attempt to force him to quit.

97. Dildine's conduct was sufficiently severe and pervasive to alter the terms, conditions, and privileges of Abed's employment and create an abusive work environment.

98. Dildine engaged in intentional discrimination with malice or with reckless indifference to Abed's federally protected rights. Dildine knew that he may be acting in violation of federal law.

99. Dildine's conduct, as Abed's supervisor and the highest-ranking full-time employee at the store, is imputable to Best Buy.

100. As a direct and proximate result of the acts and omissions alleged above, Abed has suffered and will continue to suffer substantial harm, including but not limited to, past non-economic harm (including damages for garden variety emotional distress, personal indignity, humiliation, and embarrassment), future non-economic harm (including damages for garden variety emotional distress, personal indignity, humiliation, and embarrassment), past economic damages, and future economic damages

## Count V: Violation of Title VII
### (Wrongful Termination: Religion)

101. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 100 above as if fully set forth herein.

102. Abed is a member of a protected class on account of his religion (Islam).

103. Abed suffered an adverse employment action when he was terminated.

104. Abed suffered this adverse employment action under circumstances which support an inference that the decision was on account of his religion (Islam), or in the alternative, was motivated by animus against his religion (Islam). The explanation Best Buy proffered for its decision (i.e., poor performance) is a pretext for unlawful discrimination.

105. Best Buy replaced Abed with an individual outside of his protected class.

106. As a direct and proximate result of the acts and omissions alleged above, Abed has suffered and will continue to suffer substantial harm, including but not limited to, past non-economic harm (including damages for garden variety emotional distress, personal indignity, humiliation, and embarrassment), future non-economic harm (including damages for garden variety emotional distress, personal indignity, humiliation, and embarrassment), past economic damages, and future economic damages.

## Count VI: Violation of Title VII
### (Wrongful Termination: Race and Ethnicity)

107. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 109 above as if fully set forth herein.

108. Abed is a member of a protected class on account of his race and ethnicity (Arab).

109. Abed suffered an adverse employment action when he was terminated.

110. Abed suffered this adverse employment action under circumstances which support an inference that the decision was on account of his race or ethnicity (Arab), or in the alternative, was motivated by animus against his race or ethnicity (Arab). The explanation Best Buy proffered for its decision (i.e., poor performance) is a pretext for unlawful discrimination.

111. Best Buy replaced Abed with an individual outside of his protected class.

112. As a direct and proximate result of the acts and omissions alleged above, Abed has suffered and will continue to suffer substantial harm, including but not limited to, past non-economic harm (including damages for garden variety emotional distress, personal indignity, humiliation, and embarrassment), future non-economic harm (including damages for garden variety emotional distress, personal indignity, humiliation, and embarrassment), past economic damages, and future economic damages.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and grant the following relief:

a) Award Plaintiff Two Hundred Thousand Dollars ($200,000) in back pay (lost earnings including lost wages and benefits);

b) Award Plaintiff Three Hundred Fifty Thousand Dollars ($350,000) in front pay damages;

c) Award Plaintiff Fifty Thousand Dollars ($50,000) in compensatory damages for emotional distress;

d) Award Plaintiff Four Hundred Thousand Dollars ($400,000) in punitive damages;

e) Award prejudgment interest on all liquidated sums;

f) Award attorneys' fees and costs;

g) Award permanent injunctive relief enjoining Best Buy's continued use of the BOLO customer profiling system; and

h) Award such other further relief as the Court deems just and proper.

Dated this 24th day of June, 2011.

Timothy R. Clinton (Va. Bar No. 70902)
E-mail: Tim@ClintonPeed.com
Matthew J. Peed* (DC Bar No. 503328)
E-mail: Matt@ClintonPeed.com
**CLINTON & PEED, PLLC**
1455 Pennsylvania Ave NW, Suite 400
Washington, DC 20004
(202) 621-1828
Fax: (202) 204-6320

*Attorneys for Plaintiff*

*\* Pro hac vice application to be filed*